**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

GUIDEHOUSE INC.,
1676 International Drive
McLean VA 22102

*Plaintiff*,

v.

CONTINENTAL CASUALTY COMPANY,
151 N Franklin St,
Chicago, IL 60606

*Defendant*.

Case No. 1:24-cv-12176

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Guidehouse Inc. ("Plaintiff" or "Guidehouse"), for its complaint against Defendant Continental Casualty Company ("Defendant" or "CNA"), alleges as follows:

**INTRODUCTION**

1. This is an action for breach of contract under a policy of insurance issued by Defendant to Plaintiff. Guidehouse seeks to recover the cost of a settlement with the Department of Justice relating to a *qui tam* complaint, as well as its legal fees incurred in defending against the relator's allegations.

**THE PARTIES**

2. Guidehouse is a Delaware corporation with its principal place of business in McClean, Virginia.

3. CNA is an insurance company that is incorporated in Illinois with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the claims asserted in this Complaint under 28 U.S.C. § 1332 because Plaintiff is not a citizen of the same states as Defendant, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because Defendant is a resident of Illinois with its principal place of business in this district.

6. Personal jurisdiction is proper in this judicial district because, at all relevant times, Defendant is and has been domiciled in Illinois and has been licensed to sell insurance in and have transacted business in Illinois, including with Plaintiff. Defendant also performed acts within Illinois for the purpose of realizing pecuniary benefit, namely contracting to insure persons, property, or risks, including collecting premiums for the policies at issue in this action.

## STATEMENT OF FACTS

### A. The DOJ Investigation

7. In 2021, Congress established the emergency rental assistance program ("ERAP") to provide financial assistance to low-income households to cover the costs of rent, utilities and other housing-related expenses during the COVID-19 pandemic.

8. Participating states were required to establish programs to distribute the federal funding to eligible tenants and landlords. One of the requirements for ERAP programs is that the state take certain steps to protect the personally identifiable information ("PII") of participants in their contracts with vendors.

9. In New York, the Office of Temporary and Disability Assistance ("OTDA") was the state agency responsible for administering the state's ERAP. In May 2021, Guidehouse and OTDA entered a contract under which Guidehouse, as the prime contractor, assumed certain

responsibilities for the ERAP, including for the technology and services to administer the program. Nan McKay, in turn, was Guidehouse's subcontractor and was responsible for delivering and maintaining the ERAP technology product used by applicants in New York to fill out and submit online applications requesting rental assistance. The ERAP technology product was proprietary to Nan McKay.

10. Under the contract with New York, the online ERAP portal was to undergo cybersecurity testing in its pre-production environment before it was launched to the public.

11. The state's online ERAP portal went live on June 1, 2021. Twelve hours later, OTDA shut down the ERAP portal after determining that certain applicants' PII was exposed on the internet.

12. On February 27, 2023, the United States Department of Justice ("DOJ") served Guidehouse with Civil Investigative Demand No. 23-211 ("the 2023 CID"). The 2023 CID was issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733. The 2023 CID required the production of documents and answers to interrogatories. In particular, the 2023 CID sought, among other things, information regarding Guidehouse's cybersecurity-related practices under the contract with OTDA, including compliance with cybersecurity-related contract terms and the data incident on June 1, 2021.

13. The investigation concerned allegations that Guidehouse and Nan McKay submitted, or caused the submission of, false claims "in connection with your services for the State of New York's implementation of the Emergency Rental Assistance Program."

14. Guidehouse provided notice to CNA of the 2023 CID on May 2, 2023 (the "Original Notice") and identified Morrison and Foster ("MoFo") as counsel retained to respond to the discovery requests.

15. On August 11, 2023, CNA issued its coverage position. It did not accept the Original Notice as a notice of a **Claim**, but instead accepted it as a Notice of Circumstance.

16. In August 2023, Guidehouse retained two additional law firms to assist in the response to the investigation.

17. On or about February 27, 2024, after the completion of certain witness interviews, DOJ informed Guidehouse that the CIDs were issued in connection with a *qui tam* complaint (the "Qui Tam Complaint"). DOJ did not disclose the identity of relator(s), but it made clear that it was considering intervening in the case.

18. Also on or about February 27, 2024, Guidehouse was served with a second CID No. 24-345 ("the 2024 CID"). The 2024 CID also sought information and documents relating to, among other things, Guidehouse's implementation of ERAP, certain Information Security Incidents and Information Security Breaches, the application process, compliance with the ERAP contract, Guidehouse's relationship with Nan McKay, the system used to receive rental assistance payments, PII, and cybersecurity reviews. Guidehouse provided notice to CNA of the 2024 CID on March 11, 2024 (the "Second Notice").

19. On April 2, 2024, and despite knowledge of the *qui tam* lawsuit, CNA issued a supplement coverage position relating to the Second Notice. CNA did not accept the Second Notice as notice of a **Claim**, accepting it only as a Notice of Circumstance.

20. In April 2024, DOJ provided Guidehouse with a Declaration of Nan McKay's CEO. Guidehouse responded to the allegations in the Declaration, as well as other DOJ inquiries, by letter dated April 19, 2024. At that time, Guidehouse learned the Nan McKay had already settled in principle with DOJ.

### B. The *Qui Tam* Complaint

21. Thereafter, DOJ and Guidehouse entered into settlement negotiations. As part of those negotiations, DOJ provided Guidehouse with a redacted copy of the *qui tam* complaint, which was still under seal. At that time, Guidehouse learned that relator Elevation 33, LLC had filed the *Qui Tam* Complaint in the United States District Court for the Northern District of New York in a case captioned *United States ex rel. Elevation 33, LLC v. Guidehouse Inc. and Nan McKay and Associates, Inc.*, Case No. 1:22-cv-206 (N.D.N.Y.) on March 4, 2022 (the "Civil Action").

22. In general terms, relator alleged that under ERAP, Congress had "specifically sought to protect applicants' personally identifiable information," and that the "statute specifically required the States to 'establish data privacy and security requirements' that 'include appropriate measures to ensure that the privacy of the individuals and households is protected.'"

23. Among other things, the relator contended that, in a rush to win the contract from the State of New York, Guidehouse and Nan McKay used outdated software that lacked basic security features, and that Guidehouse and Nan McKay hid this information from the State of New York, and as a result, PII was compromised. A copy of the Civil Action is attached as Exhibit A.

### C. The Settlement

24. On May 13, 2024, the United States and Guidehouse entered into a written settlement agreement (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Guidehouse agreed to pay the government $7,600,000 plus interest as well as relator's attorney fees, which were later determined to be $50,000. A copy of the Settlement Agreement is attached

as Exhibit B. Concurrent with entering into the Settlement Agreement, the United States intervened in the Civil Action.

25. The conduct covered by the Settlement Agreement involved two separate acts or omissions. The first, set forth in paragraphs (F) through (J) of the Recitals of the Settlement Agreement, was known as the "Pre-Go-Live Cybersecurity Testing and the June 1, 2021 'Information Security Breach'" and the second was known as the "Use of Unauthorized Software."

26. There was no fact finding in the Civil Action that Guidehouse committed any dishonest, fraudulent, criminal or malicious act or omission or any knowing violation of any contract or agreement.

27. There is no admission in the Settlement Agreement that Guidehouse committed any dishonest, fraudulent, criminal or malicious act or omission or any knowing violation of any contract or agreement. Indeed, the Settlement Agreement provides that "[t]he Settlement Agreement is neither an admission of liability by Guidehouse nor a concession by the United States that its claims are not well founded."

28. Under the Settlement Agreement, Guidehouse did not pay any fines, penalties, taxes, sanctions, or forfeitures.

**D. The CNA Policy.**

29. CNA issued an Enterprise Liability Policy to Guidehouse for the time period from October 15, 2022, to October 15, 2023 (the "Policy").

30. A true and correct copy of the Policy is attached as Exhibit C.

31. The Policy provides two coverages that apply to the **Wrongful Acts** identified above, the **Technology and Professional Liability** coverage and the **Privacy Regulation Investigation Expense** coverage.

32. The applicable retentions are $5,000,000 under each of these insuring agreements, and pursuant to Section V.C of the Policy, the total maximum retention amount is $5,000,000.

33. Insuring Agreements A.1, under **Enterprise Liability Coverages**, provides in relevant part:

> A. [T]he **Insurer** will pay on behalf of the **Insured** all sums, in excess of the retention and up to the applicable limit of liability, that the **Insured** shall become legally obligated to pay:
>
> > **1. Technology and Professional Liability**
> >
> > As **Damages** and **Claim Expenses** resulting from any **Claim** first made against the **Insured** during the **Policy Period**, or Extended Reporting Period, if applicable, alleging **Wrongful Acts** by the **Insured**, or by someone for whose **Wrongful Acts** the **Insured** is legally liable. ***

34. With respect to Insuring Agreement A.1, a **Wrongful Act** is defined, in relevant part, as "any actual or alleged act, error or omission: 1. committed solely in the conduct of **Professional Services** or **Technology Services** for others; or 2. resulting in the failure of the **Insured's Technology Products** to perform the function or serve the purpose intended."

35. **Technology Product** is defined, in relevant part, as "software" that is "created, designed, manufactured, sold, or distributed by or on behalf of the **Insured Entity** or licensed or leased by the **Insured Entity** to others." **Technology Services** is defined, in relevant part, as "information technology services including, but not limited to: designing, . . . testing, . . . and updating software."

36. Insuring Agreement B.3, under **Reimbursement Coverages**, provides in relevant part:

> B. [T]he Insurer will reimburse the **Insured Entity** . . . for **Privacy Regulation Investigation Expense** up to the **Privacy Regulation Investigation Expense** limit of liability and in excess of the **Privacy Regulation Investigation Expense** retention.

37. With respect to Insuring Agreement B.3, **Privacy Regulation Investigation Expense**, means, in relevant part, "all reasonable and necessary expenses incurred by the **Insured Entity** with the Insurer's prior consent, in order to respond to or effectuate compliance with a **Privacy Regulation Investigation**."

38. **Privacy Regulation Investigation** includes a "written request for information by a federal, [or] state . . . government authority in connection with any law governing **Protected Information** or any **Security Breach Notice Law**, and that is reasonably likely to give rise to a covered **Claim**."

39. **Protected Information** includes **Personal Information**, which in turn is defined as "any information relating to an identified or identifiable natural person."

40. The Policy contains exclusion titled **Deliberate Acts/Commingling or Misappropriation of Funds**. It provides, in relevant part:

> This Policy does not apply to any **Claim**:
>
> based upon or arising out of any dishonest, fraudulent, criminal or malicious act or omission, commingling, misappropriation or misuse of funds, intentional wrongdoing or knowing violation of any contract or agreement by or on behalf of an **Insured**. The Insurer shall pay **Claim Expenses** of such **Claims** unless or until a final judgment, ruling or other finding of fact in any proceeding establishes that such act, omission, commingling, misappropriation, misuse or violation . . . is so determined to have been committed, the **Insured** will reimburse the Insurer for all **Claim Expenses** paid.

### E. CNA's Denial of Coverage

41. On August 9, 2024, Guidehouse made a written request for reimbursement for its costs of defending and settling the **Claim** and/or for the cost of responding to the **Privacy Regulation Investigation**. The amount of Guidehouse's **Loss** exceeded the Policy's $5 million retention.

42. On October 18, 2024, CNA responded in writing to Guidehouse's request, stating that the amount of **Loss** did not exceed the $5 million retention.

43. Despite the lack of any findings in the Civil Action, CNA took the position that "the gravamen of the Qui Tam Civil Action is that Guidehouse made intentional and deliberate misrepresentations about its ability to perform under the ERAP contract and, then, knowingly hid the noncompliance from New York State. This amounts to allegations of fraudulent, intentional acts and/or a knowing violation of a contract and Exclusion D applies to exclude all indemnity coverage for the $7.6M settlement to resolve the Qui Tam Civil Action."

44. CNA also reserved its rights that the settlement payment constituted civil or criminal fines, penalties, taxes, sanctions, or forfeitures imposed on an Insured. However, Guidehouse paid no fines, penalties, taxes, sanctions or forfeitures under the Settlement Agreement.

45. CNA only agreed to pay **Claim Expenses** incurred on or after April 23, 2024. However, all of the **Claim Expenses** were incurred in connection with the Civil Action, as DOJ was, at all relevant times, investigating the allegations contained in the sealed *Qui Tam* Complaint. In addition, all of the legal fees were also incurred in connection with a **Privacy Regulation Investigation** going back to February 2023, and thus constitute **Privacy Regulation Investigation Expenses**.

46. In addition, CNA also sought to impose reduced reimbursement rates for Guidehouse's defense counsel. However, pursuant to the Policy, where the Insured is unable to find acceptable counsel at the maximum hourly rates listed in the Policy, then the Insured and the Insurer are to use "reasonable efforts to consult and jointly agree upon the law firm and counsel which shall provide the legal defense." CNA refused to acknowledge that acceptable counsel was not available at the rates listed in the Policy.

**CAUSE OF ACTION**

**(Breach of Contract)**

47. Plaintiff realleges and incorporates the foregoing paragraphs by reference as if fully set forth herein.

48. The Policy is a valid and binding contract governed by Virginia law.

49. Plaintiff has fulfilled all of its obligations and conditions precedent to coverage and acted in accordance with all of its rights under the Policy.

50. The Civil Action constitutes a **Claim**, and reasonable expenses incurred in connection with the defense and settlement of that **Claim** constitute **Damages** and **Claim Expenses**.

51. In addition, the 2023 and 2024 CIDs were issued in connection with a **Privacy Regulation Investigation**, and the reasonable and necessary legal fees and expenses incurred within twelve months after the Original Notice constitute **Privacy Regulation Investigation Expenses**.

52. As a direct and proximate result of the CNA's breaches of the Policy, Plaintiff incurred damages in an amount to be proven at trial and such other and further relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Guidehouse respectfully asks that the Court:

1. Award Plaintiff all available damages as compensation caused by Defendant's breaches of contract, plus pre-judgment and post-judgment interest;

2. Award Plaintiff its costs, expenses, and disbursements in this action, including attorneys' and experts' fees (if any); and

3. Grant such other and further relief as the Court may deem just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: November 26, 2024

Respectfully submitted,

/s/ *Mark Rotatori*

Mark Rotatori (N.D. Ill. 6225962)
Shea Spreyer (N.D. Ill. 6335869)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, IL 60606
Telephone: +1.312.782.3939
Facsimile: +1.312.782.8585
mprotatori@jonesday.com
sfspreyer@jonesday.com

Mark Andreini (*pro hac vice forthcoming*)
JONES DAY
901 Lakeside Ave.
Cleveland, OH, 44114
Telephone:+1.216.586.3939
Facsimile:+1.216.579,0212
mjandreini@jonesday.com

*Attorneys for Guidehouse Inc.*