IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| GUIDEHOUSE INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-1601 (RDA/IDD) |
| | ) | |
| CONTINENTAL CASUALTY COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Plaintiff Guidehouse Inc. ("Plaintiff" or "Guidehouse") and Defendant Continental Casualty Company ("Defendant" or "CNA")'s cross-motions for judgment on the pleadings (collectively, the "Motions") (Dkts. 66, 67). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motions together with Plaintiff's Memorandum in Support (Dkt. 28), the Oppositions (Dkts. 40, 41), and the Replies (Dkts. 41, 42), this Court GRANTS Plaintiff's Motion for Judgment on the Pleadings (Dkt. 67) and DENIES Defendant's Cross-Motion for Motion for Judgment on the Pleadings (Dkt. 66) for the reasons that follow.

# I. BACKGROUND

## A. Factual Background[1]

### 1. Complaint

#### (a) The DOJ Investigation

In 2021, Congress established the emergency rental assistance program ("ERAP") to provide financial assistance to low-income households to cover the costs of rent, utilities and other housing-related expenses during the COVID-19 pandemic. Dkt. 1 ¶ 7. Participating states were required to establish programs to distribute the federal funding to eligible tenants and landlords. *Id.* ¶ 8. One of the requirements for ERAP is that the state take certain steps to protect the personally identifiable information ("PII") of participants in their contracts with vendors. *Id.* In New York, the Office of Temporary and Disability Assistance (the "OTDA") was the state agency responsible for administering the state's ERAP. *Id.* ¶ 9.

In May 2021, Plaintiff and the OTDA entered a contract under which Plaintiff, as the prime contractor, assumed certain responsibilities for the ERAP, including responsibility for the technology and services to administer the program. *Id.* Nan McKay and Associates, Inc. was Plaintiff's subcontractor and was responsible for delivering and maintaining the ERAP technology product used by applicants in New York to fill out and submit online applications requesting rental assistance. *Id.* The ERAP technology product was proprietary to Nan McKay. *Id.*

[1] For purposes of considering the instant Motion for Judgment on the Pleadings, the Court accepts all facts contained within the Complaint as true for purposes of Defendant's Motion and all facts contained within the Counterclaim as true for purposes of Plaintiff's Motion, as it must at the current stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Under the contract with New York, the online ERAP portal was to undergo cybersecurity testing in its pre-production environment before it was launched to the public. *Id.* ¶ 10. The state's online ERAP portal went live on June 1, 2021. *Id.* ¶ 11. Twelve hours later, the OTDA shut down the ERAP portal after determining that certain applicants' PII was exposed on the internet. *Id.*

On February 27, 2023, the United States Department of Justice ("DOJ") served Plaintiff with Civil Investigative Demand No. 23-211 ("2023 CID"), issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-33. *Id.* ¶ 12. The investigation focused on allegations that Plaintiff and Nan McKay submitted, or caused the submission of, false claims "in connection with your services for the State of New York's implementation of the Emergency Rental Assistance Program." *Id.* ¶ 13. The 2023 CID required the production of documents and answers to interrogatories and sought, among other things, information regarding Plaintiff's cybersecurity-related practices under the contract with the OTDA, including compliance with cybersecurity-related contract terms and the data incident on June 1, 2021. *Id.* ¶ 12.

On May 2, 2023, Plaintiff provided notice to Defendant of the 2023 CID (the "Original Notice") and identified Morrison and Foster ("MoFo") as the counsel that Plaintiff had retained to respond to the discovery requests. *Id.* ¶ 14. On August 11, 2023, Defendant issued its coverage position that it did not accept the Original Notice as a Notice of a Claim, but instead accepted it as a Notice of Circumstance. *Id.* ¶ 15. In August 2023, Plaintiff retained two additional law firms to assist in the response to the investigation. *Id.* ¶ 16.

On or about February 27, 2024, Plaintiff was served with a second CID No. 24-345 ("the 2024 CID"). *Id.* ¶ 18. The 2024 CID also sought information and documents relating to, among other things, Plaintiff's implementation of the ERAP, certain Information Security Incidents and Information Security Breaches, the application process, compliance with the ERAP contract,

Plaintiff's relationship with Nan McKay, the system used to receive rental assistance payments, PII, and cybersecurity reviews. *Id.* Also, on or about February 27, 2024, after the completion of certain witness interviews, the DOJ informed Plaintiff that the CIDs were issued in connection with a *Qui Tam* complaint (the "*Qui Tam* Complaint"). *Id.* ¶ 17. The DOJ did not disclose the identity of relator(s), but it made clear that it was considering intervening in the case. *Id.*

On March 11, 2024, Plaintiff provided notice to Defendant of the 2024 CID (the "Second Notice"). *Id.* ¶ 18. On April 2, 2024, Defendant, with knowledge of the *Qui Tam* lawsuit, issued a supplement coverage position relating to the Second Notice. *Id.* ¶ 19. Defendant again did not accept the Second Notice as a Notice of a Claim, accepting it only as a Notice of Circumstance. *Id.* In April 2024, the DOJ provided Plaintiff with a Declaration of Nan McKay's CEO. *Id.* ¶ 20. Plaintiff responded to the allegations in the Declaration, as well as other DOJ inquiries, by letter dated April 19, 2024. *Id.* At that time, Plaintiff learned the Nan McKay had already settled in principle with the DOJ. *Id.*

(b) The *Qui Tam* Complaint

Subsequently, the DOJ and Plaintiff entered into settlement negotiations and, as part of those negotiations, the DOJ provided Plaintiff with a redacted copy of the *Qui Tam* Complaint, which was still under seal. *Id.* ¶ 21. At that time, Plaintiff learned that, on March 4, 2022, relator Elevation 33, LLC had filed the *Qui Tam* Complaint in the United States District Court for the Northern District of New York.[2] *Id.* Elevation 33, LLC alleged that, under ERAP, Congress had "specifically sought to protect applicants' personally identifiable information," and that the "statute specifically required the States to 'establish data privacy and security requirements' that

[2] *United States ex rel. Elevation 33, LLC v. Guidehouse Inc. and Nan McKay and Associates, Inc.*, Case No. 1:22-cv-206 (N.D.N.Y.) (the "Civil Action").

'include appropriate measures to ensure that the privacy of the individuals and households is protected.'" *Id.* ¶ 22. Among other things, the relator further contended that, in a rush to win the contract from the State of New York, Plaintiff and Nan McKay used outdated software that lacked basic security features, that Plaintiff and Nan McKay hid this information from the State of New York, and that, as a result, PII was compromised. *Id.* ¶ 23.

(c) The Settlement

On May 13, 2024, the United States and Plaintiff entered into a written settlement agreement (the "Settlement Agreement"). *Id.* ¶ 24. The conduct covered by the Settlement Agreement involved two separate acts or omissions. *Id.* ¶ 25. The first, set forth in paragraphs (F) through (J) of the Recitals of the Settlement Agreement, was known as the "Pre-Go-Live Cybersecurity Testing and the June 1, 2021 'Information Security Breach'" and the second was known as the "Use of Unauthorized Software." *Id.* Concurrent with entering into the Settlement Agreement, the United States intervened in the Civil Action. *Id.* ¶ 24.

Pursuant to the Settlement Agreement, Plaintiff agreed to pay the government $7,600,000 plus interest, as well as the relator's attorney fees, which were later determined to be $50,000. *Id.* However, Plaintiff did not agree to pay any fines, penalties, taxes, sanctions, or forfeitures and there is no admission in the Settlement Agreement that Plaintiff committed any dishonest, fraudulent, criminal or malicious act or omission or any knowing violation of any contract or agreement. *Id.* ¶¶ 27-28. The Settlement Agreement provides that "[t]he Settlement Agreement is neither an admission of liability by Guidehouse nor a concession by the United States that its claims are not well founded." *Id.* ¶¶ 27. There was also no factfinding in the Civil Action that Plaintiff committed any dishonest, fraudulent, criminal or malicious act or omission or any knowing violation of any contract or agreement. *Id.* ¶ 26.

(d) The CNA Policy

For the time period from October 15, 2022 through October 15, 2023, Defendant issued an Enterprise Liability Policy to Plaintiff (the "Policy"). *Id.* ¶ 29. The Policy provides two coverages that Plaintiff alleges apply to the acts identified above: the Technology and Professional Liability coverage and the Privacy Regulation Investigation Expense coverage. *Id.* ¶ 31. The applicable retentions are $5,000,000 under each of these insuring agreements, and the total maximum retention amount is $5,000,000. *Id.* ¶ 32.

The Technology and Professional Liability coverage provides for, in relevant part:

> Damages and Claim Expenses resulting from any Claim first made against the Insured during the Policy Period, or Extended Reporting Period, if applicable, alleging Wrongful Acts by the Insured, or by someone for whose Wrongful Acts the Insured is legally liable.

*Id.* ¶ 33. This provision defines Wrongful Act as "any actual or alleged act, error or omission: 1. committed solely in the conduct of Professional Services or Technology Services for others; or 2. resulting in the failure of the Insured's Technology Products to perform the function or serve the purpose intended." *Id.* ¶ 34. Technology Product is defined as "software" that is "created, designed, manufactured, sold, or distributed by or on behalf of the Insured Entity or licensed or leased by the Insured Entity to others," and Technology Services is defined as "information technology services including, but not limited to: designing, . . . testing, . . . and updating software." *Id.* ¶ 35.

The Privacy Regulation Investigation Expense coverage provides, in relevant part:

> [T]he Insurer will reimburse the Insured Entity . . . for Privacy Regulation Investigation Expense up to the Privacy Regulation Investigation Expense limit of liability and in excess of the Privacy Regulation Investigation Expense retention.

*Id.* ¶ 36. With respect to this provision, Privacy Regulation Investigation Expense, means "all reasonable and necessary expenses incurred by the Insured Entity with the Insurer's prior consent,

in order to respond to or effectuate compliance with a Privacy Regulation Investigation." *Id.* ¶ 37. Privacy Regulation Investigation includes a "written request for information by a federal, [or] state . . . government authority in connection with any law governing Protected Information or any Security Breach Notice Law, and that is reasonably likely to give rise to a covered Claim." *Id.* ¶ 38. Protected Information includes Personal Information, which in turn is defined as "any information relating to an identified or identifiable natural person." *Id.* ¶ 39.

The Policy also contains an exclusion titled Deliberate Acts/Commingling or Misappropriation of Funds, which provides, in relevant part, that the Policy does not apply to any Claim

> based upon or arising out of any dishonest, fraudulent, criminal or malicious act or omission, commingling, misappropriation or misuse of funds, intentional wrongdoing or knowing violation of any contract or agreement by or on behalf of an Insured. The Insurer shall pay Claim Expenses of such Claims unless or until a final judgment, ruling or other finding of fact in any proceeding establishes that such act, omission, commingling, misappropriation, misuse or violation . . . is so determined to have been committed, the Insured will reimburse the Insurer for all Claim Expenses paid.

*Id.* ¶ 40.

(e) Defendant's Denial of Coverage

On August 9, 2024, Plaintiff made a written request for reimbursement for the costs of defending and settling the Claim and/or for the cost of responding to the Privacy Regulation Investigation. *Id.* ¶ 46. Plaintiff asserts that the amount of Plaintiff's Loss exceeded the Policy's $5 million retention. *Id.*

On October 18, 2024, Defendant responded in writing to Plaintiff's request, stating that the amount of Loss did not exceed the $5 million retention. *Id.* ¶ 42. Defendant took the position that "the gravamen of the *Qui Tam* Civil Action is that Guidehouse made intentional and deliberate misrepresentations about its ability to perform under the ERAP contract and, then, knowingly hid

the noncompliance from New York State. This amounts to allegations of fraudulent, intentional acts and/or a knowing violation of a contract and Exclusion D applies to exclude all indemnity coverage for the $7.6M settlement to resolve the *Qui Tam* Civil Action." *Id.* ¶ 43 (quoting Insurance Claim Denial Letter (dated October 18, 2024), Pl.'s Opp'n Mot. Transfer Ex. A, at 5 (Dkt. 26-5)). Defendant also reserved its rights that the settlement payment constituted civil or criminal fines, penalties, taxes, sanctions, or forfeitures imposed on an Insured. *Id.* ¶ 44.

Defendant only agreed to pay Claim Expenses incurred on or after April 23, 2024. *Id.* ¶ 45. Plaintiff asserts that all of the Claim Expenses were incurred in connection with the Civil Action, as the DOJ was, at all relevant times, investigating the allegations contained in the sealed *Qui Tam* Complaint. *Id.* In addition, Plaintiff asserts that all of the legal fees were also incurred in connection with a Privacy Regulation Investigation going back to February 2023, and, thus, constitute Privacy Regulation Investigation Expenses. *Id.*

Defendant also sought to impose reduced reimbursement rates for Plaintiff's Defense Counsel. *Id.* ¶ 46. Pursuant to the Policy, where the Insured is unable to find acceptable counsel at the maximum hourly rates listed in the Policy, then the Insured and the Insurer are to use "reasonable efforts to consult and jointly agree upon the law firm and counsel which shall provide the legal defense." *Id.* Plaintiff alleges that Defendant refused to acknowledge that acceptable counsel was not available at the rates listed in the Policy. *Id.*

2. Counterclaim

(a) Civil Investigative Demands

Defendant asserts that the 2023 CID specifically stated:

> This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that you, and/or Nan McKay and Associates Inc. submitted, or caused the

> submission of, false claims in connection with your services for the State of New York's implementation of the Emergency Rental Assistance Program.

*Id.* ¶¶ 8-9. On or about February 27, 2024, the DOJ issued the 2024 CID, which included the same two statements verbatim. *Id.* ¶¶ 10-11. Defendant alleges that at least one other insurer has acknowledged a duty to defend with respect to the 2023 CID and the 2024 CID. *Id.* ¶ 12.

(b) The Civil Action

Defendant asserts that the Civil Action contains the following allegations regarding Plaintiff's conduct with respect to the ERAP:

After Plaintiff entered into the contract with the State of New York, Plaintiff discovered that aspects of software developed by NMA were "hopelessly outdated and failed to meet the modern standards required by the contract." *Id.* ¶ 18. The Director in Plaintiff's Cybersecurity practice refused to certify that the software program met the contract's cybersecurity requirements, despite being pressured to do so by the Partner in charge of Plaintiff's State and Local Government practice. *Id.* ¶ 19. Following the Director's refusal, the Partner asked Plaintiff's Chief Information Officer ("CIO") to help with respect to the certification of the software. *Id.* ¶ 20. The CIO assigned a junior technician to analyze the system who, after performing basic checks on the program, found that applicant names were "accessible from the internet and unencrypted—a glaring security breach." *Id.* ¶ 21. Although the technician informed the CIO of the system deficiencies, and the CIO informed the Partner of the same, Plaintiff "did not inform New York State and instead certified that Nan McKay's systems meet the contract requirements." *Id.* ¶ 22. The Civil Action alleged that, when Plaintiff began taking applications for assistance, it realized the system was insufficient to meet the requirements of the contract, the contract was widely known as a disaster within Guidehouse, and Plaintiff identified additional problems almost every day. *Id.* ¶ 23.

The Civil Action asserted two claims for relief under the False Claims Act against Plaintiff and Nan McKay. *Id.* ¶ 24. The first claim for relief alleged that the "Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment" and that "Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, materially false and fraudulent claims for payment." *Id.* ¶ 25. The second claim for relief alleged that "Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests." *Id.* ¶ 26.

(c) Request for Payment by Guidehouse

Plaintiff seeks coverage from Defendant of the defense and investigation costs associated with the 2023 CID and the 2024 CID, as well as defense and indemnity costs associated with the Civil Action. *Id.* ¶ 28. Defendant has declined to pay Plaintiff under the Policy on the basis that coverage is not available for the 2023 CID, 2024 CID, or the Civil Action and, even if coverage was available, it would not exceed the Policy's $5 million self-insured retention. *Id.* ¶ 29.

(c) The Policy

Defendant issued Policy No. 652158715 to Plaintiff for the policy period October 15, 2022 to October 15, 2023. *Id.* ¶ 30. The Policy's Technology and Professional Liability coverage and Privacy Regulation Investigation coverage components each carry a liability limit of $10 million, subject to a $5 million self-insured retention. *Id.* ¶¶ 31-32. The Policy also contains a Deliberate Acts/Commingling or Misappropriation of Funds exclusion (the "Deliberate Acts Exclusion"),

which bars coverage for any Claim based upon or arising out of any "dishonest, fraudulent, criminal, or malicious act or omission, commingling, misappropriation, or misuse of funds, intentional wrongdoing or knowing violation of any contract or agreement by or on behalf of an Insured." *Id.* ¶ 49.

The Technology and Professional Liability coverage part provides that Defendant will pay those sums in excess of the applicable retention "as Damages and Claim Expenses resulting from any Claim first made against the Insured during the Policy Period . . . alleging Wrongful Acts by the Insured, or by someone for whose Wrongful Acts the Insured is legally liable[.]" *Id.* ¶ 36. The Policy defines Wrongful Act to mean any actual or alleged act, error, omission or Personal/Proprietary Injury "committed solely in the conduct of . . . Technology Services" or "resulting in the failure of the Insured's Technology Products to perform the function or serve the purpose intended." *Id.* ¶ 42. The Policy's definition of Claim specifically excludes "any criminal proceeding or criminal or civil investigation." *Id.* ¶ 37. The Policy's definition of Damages specifically excludes "civil or criminal fines, penalties, taxes, sanctions or forfeitures, imposed on an Insured." *Id.* ¶ 42. Settlements are, however, included in the Policy's definition of Damages and are not Claim Expenses, as that term is defined in the Policy. *Id.* ¶ 56.

The Policy's Privacy Regulation Investigation coverage part allows for the reimbursement of expenses related to a Privacy Regulation Investigation, which is defined in the Policy as "a civil, administrative or regulatory investigation or written request for information by a federal, state, local or foreign governmental authority in connection with any law governing Protected Information or any Security Breach Notice Law, arising from an actual or alleged Privacy Injury." *Id.* ¶¶ 62-63.

B. Procedural Background

On November 26, 2024, Plaintiff filed its Complaint in the Northern District of Illinois. Dkt. 1. After requesting an extension of time (which was granted), on January 14, 2025, Defendant filed its Answer, Affirmative Defenses, and Counterclaim to Plaintiff's Complaint. Dkt. 15. On January 17, 2025, Plaintiff filed a Joint Initial Status Report. Dkt. 17.

On January 28, 2025, Defendant filed its Motion to Transfer. Dkt. 19. Plaintiff filed its Answer to Counterclaim and Affirmative Defenses on February 4, 2025. Dkt. 22. While the Motion to Transfer was pending, Plaintiff filed its Motion for Judgment on the Pleadings (Dkt. 27) and its Memorandum in Support (Dkt. 28). On March 11, 2025, Defendant filed its Combined Rule 12(c) Motion for Judgment on the Pleadings and Response to Guidehouse's Rule 12(c) Motion for Judgment on the Pleadings. Dkt. 40. On March 25, Plaintiff filed its Combined Reply in Support of Motion for Judgment on the Pleadings and Opposition to Defendant's Cross-Motion. Dkt. 41. On April 8, 2025, Defendant filed its Reply in Support of its Rule 12(c) Motion for Judgment on the Pleadings. Dkt. 42.

On September 23, 2025, the Honorable Edmond E. Chang of the Northern District of Illinois issued a Memorandum Opinion and Order finding that the convenience to the non-party witnesses and the interest of justice weighed in favor of transfer. Dkt. 49. The Order granted the Defendant's Motion to Transfer to the Eastern District of Virginia and terminated the Motion for Judgment on the Pleadings without prejudice to refiling in the transferee district. *Id*. On September 26, 2025, the case was transferred from the Northern District of Illinois to this Court. Dkt. 51.

On October 9, 2025, Plaintiff filed an Agreed Motion to Schedule a Case Management Conference, which this Court granted on October 15, 2025. Dkts 62-63. Plaintiff filed a Joint

Status Report on October 29, 2025. Dkt. 64. A Case Management Conference was held on October 30, 2025, where Counsel for both Parties made their appearance and the Parties were instructed to refile their Motions for Judgments on the Pleadings incorporating associated memoranda by reference. Dkt. 65. On November 5, 2025, Defendant filed its Cross Motion for Judgment on the Pleadings (Dkt. 66) and Plaintiff filed its Motion for Judgment on the Pleadings (Dkt. 67). On August 5, 2026, Plaintiff filed a Joint Status Report inquiring as to the status of the case. Dkt. 69.[3]

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Nonetheless, the standard of review for Rule 12(c) motions is the same "plausibility standard" that governs Rule 12(b)(6) motions. *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014); *Travelers Indem. Co. of Conn. v. Lessard Design, Inc.*, 321 F. Supp. 3d 631, 635 (E.D. Va. 2018). "A Rule 12(c) motion for judgment on the pleadings is appropriate when all material allegations of fact are admitted in the pleadings and only questions of law remain." *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 805 F. Supp. 2d 213, 216 (E.D. Va. 2011) (quoting *Republic Ins. Co. v. Culbertson*, 717 F. Supp. 415, 418 (E.D. Va. 1989)), *aff'd*, 494 F. App'x 394 (4th Cir. 2012). A motion for judgment on the pleadings challenges a claim's sufficiency, "it does not resolve

[3] The Court appreciates that the Court has not resolved the pending Motions as quickly as the parties may have preferred. The Court notes that this Division has been inundated with hundreds of habeas applications, each of which requires expeditious review and each of which involves an individual in custody who desires release. Nor does the Court's regular civil and criminal dockets stop progressing forward to take account of this new influx of cases. Indeed, this year, more than *three thousand* civil cases have been filed in the Alexandria Division alone. This District Judge has also personally presided over eight criminal trials in this time period. The Court treats each of its cases with the same level of importance that the parties treat this single case; accordingly, this Court has addressed this case in due course.

disputes over factual issues, the merits of a claim, or the applicability of a defense." *SunTrust Mortg., Inc. v. Simmons First Nat'l Bank*, 861 F. Supp. 2d 733, 735 (E.D. Va. 2012) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Thus, "judgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief[.]" *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).

## III. ANALYSIS

This action concerns an insurance-coverage dispute regarding Defendant's obligations under the Policy issued to Plaintiff. As discussed above, Plaintiff seeks reimbursement from Defendant for its defense and indemnity costs associated with the Civil Action and resulting settlement, as well as defense and investigation costs associated with the two CIDs. Defendant seeks a determination of its rights and obligations under the Policy, asserting that it has no duty to defend or indemnify Plaintiff on the basis that coverage is not available for the 2023 CID, 2024 CID, or the Civil Action. Three Policy provisions bear on those disputes: the Technology and Professional Liability coverage, the Deliberate Acts/Commingling or Misappropriation of Funds Exclusion, and the Privacy Regulation Investigation coverage. Because the ultimate issues here are issues of contract, the Court first analyzes how the three applicable contractual provisions apply. The Court addresses each in turn after setting forth the governing principles of Virginia insurance law. After having determinations regarding the applicability of the three aforementioned contractual provisions, the Court will determine how to resolve each pending Motion.

### A. Virginia Insurance Law

Although the Policy itself does not include a choice-of-law provision, *see generally* Dkt. 1-3, both parties agree that Virginia law governs this coverage dispute. Dkt. 1 ¶ 48; Dkt. 19 at 11.

That conclusion is also consistent with the Northern District of Illinois' Order transferring this action, which determined that Virginia substantive law would govern the parties' coverage dispute. See *Guidehouse Inc. v. Continental Casualty Co.*, 2025 WL 2712277, at *3 (N.D. Ill. Sept. 23, 2025) (noting that the Policy was delivered to Plaintiff in Virginia, where Plaintiff maintains its principal place of business, and that Virginia was presumably where Plaintiff engaged in the conduct underlying the claims for which it seeks coverage, including submitting claims to Defendant and entering the Settlement Agreement). Accordingly, the Court applies Virginia substantive law in interpreting the Policy.

Under governing Virginia law, "[i]nterpreting insurance policy coverage relies on general principles of contract law." *Nationwide Gen. Ins. Co. v. Staples*, 626 F. Supp. 3d 899, 905 (E.D. Va. 2022); *see also Hill v. State Farm Mut. Auto. Ins. Co.*, 237 Va. 148, 152 (1989) ("An insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction."). As the Supreme Court of Virginia has recognized:

> Insurance policies are to be construed according to their terms and provisions and are to be considered as a whole. Where there is doubt or uncertainty and where the language of a policy is susceptible of two constructions, it is to be construed liberally in favor of the insured and strictly against the insurer. Where two interpretations equally fair may be made, the one which permits a greater indemnity will prevail because indemnity is the ultimate object of insurance.

*White Tire Dist. v. Pa. Nat. Mutual*, 235 Va. 439, 441 (1988) (quoting *Surety Corp. v. Elder*, 204 Va. 192, 197 (1963)).

Judges in this District have held that "Virginia law . . . recognizes that the duty to defend is broader than the duty to indemnify." *Bohreer v. Erie Ins. Grp.*, 475 F. Supp. 2d 578, 584 (E.D. Va. 2007) (citing *VEPCO v. Northbrook Property & Cas. Ins.*, 252 Va. 265, 268 (1996)). Thus, under Virginia law, an insurer has a duty to defend an insured when the complaint "alleges facts

and circumstances, some of which would, if proved, fall within the risk covered by the policy." *Id.* at 584 (cleaned up). By contrast, the duty to indemnify refers to "an insurer's responsibility to pay a monetary award when its insured has become liable for a covered claim." *Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502, 513 (E.D. Va. 2011) (cleaned up). When both the duty to defend and the duty to indemnify are at issue, analysis begins with the duty to defend; this is so because an insurer with no duty to defend logically cannot have a duty to indemnify. *See Bohreer*, 475 F. Supp. 2d at 584. But an insurer with a duty to defend may not necessarily also have a duty to indemnify.

To assess the duty to defend, Virginia courts employ the "Eight Corners Rule," which "requires a court to compare the four corners of the insurance policy against the four corners of the underlying complaint; if any allegations may potentially be covered by the policy, the insurer has a duty to defend." *Capitol Env't Servs., Inc. v. N. River Ins. Co.*, 536 F. Supp. 2d 633, 639 (E.D. Va. 2008); *see Lerner v. Safeco*, 219 Va. 101, 104 (1978) (holding that a duty to defend "arises whenever the complaint [against the insured] alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy"). "The Eight Corners Rule is a combination of the Exclusive Pleading Rule, under which 'an insurer's duty to defend is determined solely by the claims asserted in the pleadings' and the Potentiality Rule, under which 'an insurer's duty to defend is triggered if there is any 'potentiality' that the allegations in the pleadings could state a claim that would be covered by the policy.'" *Capitol Env't Servs.*, 536 F. Supp. 2d at 640 n.14 (quoting *Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 791 (E.D. Va. 2001)); *Marks v. Scottsdale Ins. Co.*, 791 F.3d 448, 453 (4th Cir. 2015) ("[U]nder Virginia's 'eight corners rule' we look only to [plaintiff's] underlying complaint, and determine whether its allegations against [the insured] come within the scope of the Policy's coverage.")

(citing *AES Corp. v. Steadfast Ins. Co.*, 283 Va. 609, 617 (2012)). In applying the Eight Corners Rule, the Fourth Circuit has recognized that "Virginia courts have not signaled a readiness to look beyond the underlying complaint" and declined to look at documents attached to the complaint or on which the complaint relies. *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 156 (4th Cir. 2009). The same cannot be said of the duty to indemnify. Instead, in suits with underlying settlement agreements that may have settled *both* covered and non-covered conduct under a policy, courts consider "a variety of factors short of a full trial of the original suit." *Perdue Farms, Inc. v. Travelers Cas. & Surety Co. of Am.*, 448 F.3d 252, 264 (4th Cir. 2006) (applying Maryland law but based on a principle that also applies under Virginia law).

"Virginia law is clear that policy exclusions are an affirmative defense and, in consequence, 'the burden is upon the insurer to prove that an exclusion applies.'" *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 800 F. Supp. 2d 722, 731 (E.D. Va. 2011), *aff'd sub nom. Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co. of N. Carolina*, 508 F. App'x 243 (4th Cir. 2013) (quoting *Allstate Ins. Co. v. Gauthier*, 641 S.E.2d 101, 104 (2007)). "Moreover, it is settled in Virginia that '[e]xclusionary language in an insurance policy will be construed most strongly against the insurer.'" *Id.* (quoting *American Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 585 (1989)). "Reasonable exclusions not in conflict with statute in an insurance contract will be enforced, but it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous." *State Farm Mutual Ins. Co. v. Gandy*, 383 S.E.2d 717, 719 (1989).

### B. Technology And Professional Liability Coverage

As a preliminary matter, this Court notes that the Technology and Professional Liability part of the Policy does not apply to the CIDs because the Policy's definition of "Claim" expressly excludes "any criminal proceeding or criminal or *civil investigation*." Dkt. 15 at 25 (emphasis

added). Plaintiff does not dispute that point. The Court therefore considers only whether the Civil Action falls within the scope of the coverage provided by the Technology and Professional Liability part of the Policy.

Under this coverage provision, Defendant agrees to pay, subject to the applicable retention and limit of liability, "Damages and Claim Expenses resulting from any Claim first made against the Insured during the Policy Period . . . alleging Wrongful Acts by the Insured, or by someone for whose Wrongful Acts the Insured is legally liable." Dkt. 1 ¶ 33. A "Wrongful Act," as relevant here, includes "any actual or alleged act, error, or omission" committed "solely in the conduct of Professional Services or Technology Services for others." *Id.* ¶ 34. The Policy, in turn, defines "Technology Services" to include, among other things, designing, developing, testing, supporting, maintaining, and updating software; planning and maintaining computer and electronic systems; and managing and operating computer systems and networks. Dkt. 28 at 10-11.

The parties do not dispute that the Civil Action constitutes a "Claim," which the Policy defines to include "a civil proceeding in a court of law or equity or any alternative dispute resolution proceeding." Dkts. 15 at 25; 41 at 21. Their dispute instead concerns whether the Civil Action alleged a covered "Wrongful Act," whether it sought covered "Damages," and whether the eventual settlement falls outside the definition of damages.

(a) <u>Defendant Has Abandoned Its Independent Arguments That the Civil Action Does Not Satisfy the Coverage Grant.</u>

Before addressing the merits of the Technology and Professional Liability coverage, the Court must determine the effect of Defendant's decision not to defend several grounds pleaded in its Counterclaim. The parties characterize the consequence of that silence differently. Plaintiff contends that Defendant has "abandoned" the contrary allegations in its Counterclaim. Dkt. 41 at 7-8. The Court agrees in substance, although some precision in terminology is necessary.

Defendant's Counterclaim alleged three independent reasons why the Civil Action fell outside the Technology and Professional Liability coverage grant. Specifically, Continental alleged that: (1) the *Qui Tam* Complaint did not allege a covered "Wrongful Act"; (2) the *Qui Tam* Complaint did not seek covered "Damages" resulting from such an act; and (3) the settlement constituted, in whole or in part, a fine, penalty, tax, sanction, forfeiture, or otherwise uninsurable loss. Dkt. 15 ¶¶ 43-47. Those theories were distinct from Defendant's separate contention that the Deliberate Acts Exclusion eliminated coverage that otherwise would exist. *See id.* ¶¶ 48-58.

Plaintiff's Rule 12(c) motion directly challenged each of those pleaded grounds. It argued that the *Qui Tam* Complaint alleged Wrongful Acts because the alleged misconduct arose from Guidehouse's performance of Technology Services; that the *Qui Tam* Complaint sought covered Damages, including compensatory and multiplied damages; and that the negotiated settlement was not established to constitute an excluded fine, penalty, sanction, or forfeiture. Dkt. 28 at 10-13. Defendant therefore had notice that Plaintiff sought judgment on each of the independent coverage theories pleaded in paragraphs 43 through 58 of the Counterclaim. Defendant did not substantively develop those initial coverage theories in its Response to Plaintiff's Motion. *See generally* Dkt. 40. Its Opposition does not defend its allegation that the *Qui Tam* Complaint failed to allege a Wrongful Act; does not argue that the *Qui Tam* Complaint failed to seek Damages; and it does not develop its pleaded contention that the settlement falls outside the definition of Damages as a fine, penalty, sanction, forfeiture, or otherwise uninsurable amount. *Id.*

The Fourth Circuit distinguishes abandonment of a claim from a party's failure to preserve or develop a particular argument supporting that claim. A pleaded claim ordinarily should not be deemed abandoned absent a sufficiently clear indication that the party no longer intends to pursue it. In *AirFacts, Inc. v. de Amezaga*, the Fourth Circuit reversed a finding of abandonment

where the plaintiff had failed adequately to address one contractual theory during closing argument but had otherwise continued to pursue the claim. 909 F.3d 84, 91-93 (4th Cir. 2018). In *AirFacts, Inc. v. de Amezaga*, the Fourth Circuit explained that, absent an express abandonment, relinquishment of a claim must be "clear and unambiguous"; mere silence or ambiguous advocacy is insufficient where the party has otherwise continued to pursue the claim. *Id.* That principle prevents the Court from concluding that Defendant abandoned Count II in its entirety. Defendant continues to seek a declaration under Count II that it has no obligation to indemnify Guidehouse for the Civil Action, and it has extensively briefed the Deliberate Acts Exclusion as a basis for that requested relief. Dkt. 42 at 9-13. As with *AirFacts*, Defendant's litigation position here "was at most ambiguous, not a clear and express abandonment of the claim." 909 F.3d at 92. Moreover, under Virginia law, Plaintiff, as the insured, bears the initial burden of establishing that the claimed liability falls within the coverage grant. *Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 729 F.3d 520, 528 (4th Cir. 2015); *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005). Defendant's abandonment of an argument supporting its Counterclaim does not shift that burden or establish Plaintiff's entitlement to judgment by default.

Accordingly, consistent with *Stevenson*, the Court independently examines the pleaded theories.

(b) <u>The Civil Action Alleged a "Wrongful Act."</u>

The *Qui Tam* Complaint alleges acts and omission falling within the Policy's definition of Wrongful Act. The Policy broadly defines Wrongful Act, in relevant part, to include "any actual or alleged act, error, or omission [] committed solely in the conduct of Professional Services or Technology Services for others." Dk. 1 ¶ 34. Technology Services is defined, in relevant part, as:

A. information technology services including, but not limited to:

> 1. designing, **developing**, programming, writing, **testing**, **installing**, servicing, supporting, maintaining, repairing, and updating **software** including any modification and reengineering and providing training, updates and support;
> 2. planning, designing, **developing**, engineering, **installation** and maintaining **computer systems**, computer networks and electronic systems;
> 3. managing and **operating computer systems**, computer networks and facilities, as well as facilities support services;

Dkt. 1-3 at 17 (emphasis added).

The allegations fit those definitions directly. Among other things, the relator alleged that Plaintiff:

> 3. While claiming to have the technical capabilities to **deliver** [the ERAP] **program**, they were not prepared to move quickly; they were instead interested in cashing in on the pandemic, providing New York with an untested, outdated, unstable, and insufficient solution that left New Yorkers' personal information exposed, delayed relief, and left many New Yorkers without relief at all.
>
> 4. *** In fact, Guidehouse did little to no due diligence on Nan McKay's system before winning the contract and, in addition, did not effectively estimate the number of resources it need to quickly disburse funds to eligible recipients. When Guidehouse actually started to **operate the system**, it quickly realized that the **system was developed** in the early 2010s and still ran on decades-old technology. Thus, as a sophisticated consulting company with expertise in Government contracting, Guidehouse was aware the **system lacked basic security features and the capability to process applications accurately and efficiently**.
>
> 5. Guidehouse hid these failures from New York, falsely certifying the system met the contract's requirements.

Dkt 1-1 ¶¶ 3-5 (emphasis added). Those allegations concern the design, testing, implementation, and operation of the technology Plaintiff supplied in connection with ERAP—the activities expressly identified as Technology Services. Whether the relator could prove such allegations is not the question to be resolved here. Rather, the question is whether the alleged conduct, if proved, would constitute an act, error, omission, misstatement, or breach of duty in the conduct of Technology Services. In this Court's view, it would.

That the relator asserted those allegations through a False Claims Act cause of action does not alter that conclusion. Virginia law looks to the substance of the conduct alleged, not merely to the cause of action or the legal theory under which the plaintiff seeks relief. In *Jefferson-Pilot Fire & Casualty Co. v. Boother, Prichard & Dudley*, the Fourth Circuit, applying Virginia law, rejected a similar effort to characterize an underlying claim by its legal label and considered whether antitrust claims against a law firm arose from the firm's professional services. *See* 638 F.2d 670, 674-75 (4th Cir. 1980). The Fourth Circuit did not treat the antitrust label as dispositive. *Id.* Instead, it examined the acts underlying the claims and concluded that the alleged injury arose from the law firm's provision of legal services. *Id.* The Fourth Circuit explained that the relevant inquiry was whether the conduct is based on conduct performed in the insured's professional capacity, not whether the underlying plaintiff used professional-negligence terminology. *Id.*

The same reasoning applies here. The relator's False Claims Act theories were predicated on alleged deficiencies in Plaintiff's performance of technology-related services. The *Qui Tam* Complaint does not allege an unrelated physical accident, employment dispute, or purely financial transactions. It alleges that Plaintiff's technology design, implementation, testing, operation, security, and related representations failed to satisfy requirements governing ERAP. *See* Dkt 1-1 ¶¶ 3-5. Those allegations fall within the Policy's express description of Technology Services.

The Fourth Circuit's decision in *Republic Franklin Insurance Co. v. Albemarle County School Board*, 670 F.3d 563 (4th Cir. 2012), is also instructive. There, the Fourth Circuit held that an alleged violation of the Fair Labor Standards Act could constitute a "wrongful act" under a professional-liability policy defining that term broadly to include "any breach of duty, neglect, error, omission, misstatement, or misleading statement in the discharge of 'educational institution'

duties." *Id.* at 566-68. The Fourth Circuit again rejected the insurer's effort to treat the statutory nature of the claim as dispositive. *Id.* It distinguished the conduct giving rise to liability from the remedy sought for that conduct and held that the statutory violation could fall within the policy's broad coverage grant even though the loss may not. *Id.* at 567 ("While a preexisting duty might be relevant to whether an insured suffers an insurable *loss,* it cannot be relevant to whether the insured is the subject of a claim for a *wrongful act. Every* duty breached or violated is necessarily a preexisting duty, and it is the *breach* or *violation* of that duty which constitutes a wrongful act." (emphasis in original)). The same principle applies here. The False Claims Act supplied the relator's theory of liability; the acts and omissions allegedly giving rise to that liability concerned Plaintiff's provision of Technology Services.

Defendant's contrary reading would effectively add a limitation that the Policy does not contain: that a Wrongful Act must be pleaded as a common-law negligence claim or must be independent of any statutory cause of action. Courts may not rewrite an insurance policy by inserting such a restriction. *See TravCo Ins. Co. v. Ward*, 284 Va. 547, 552-53 (2012) (requiring courts to apply unambiguous policy language according to its ordinary meaning and noting that "insurers are required to draft exclusions limiting coverage in language that clearly and unambiguously defines their scope"). The Policy covers alleged acts and omissions in the conduct of Technology Services; the *Qui Tam* Complaint alleges such acts and omissions. The legal theory professed does not displace the underlying conduct for purposes of the Policy. The Court therefore concludes that the *Qui Tam* Complaint alleged a covered Wrongful Act within the Technology and Professional Liability coverage grant.

(c) The *Qui Tam* Complaint Sought Covered "Damages."

The *Qui Tam* Complaint also sought Damages within the meaning of the Policy. The Policy defines Damages as "settlements, judgment, . . . or other amounts for which the Insured is legally obligated to pay," including "punitive and exemplary damages and the multiplied portion of multiplied awards." Dkt. 1-3 at 11 (emphasis added). The Policy excludes from Damages "civil or criminal fines, penalties, taxes, sanctions or forfeitures, imposed on an Insured." *Id.* The *Qui Tam* Complaint sought monetary relief for alleged losses sustained by the Government, treble damages under the False Claims Act, and statutory civil penalties. Dkt. X at X. The *Qui Tam* Complaint therefore sought at least some relief that falls within the Policy's affirmative coverage for Damages.

The False Claims Act's remedial structure confirms that the *Qui Tam* Complaint sought more than a penalty in the narrow sense. Section 3729(a) authorizes a civil penalty for each false claim and, separately, damages consisting of three times the Government's damages. 31 U.S.C. § 3729(a)(1). The statute thus distinguishes between the fixed civil penalty for each false claim and the damages-based remedy measured by the Government's actual loss. That distinction matters under the Policy, which does not exclude every monetary amount sought in an action involving statutory penalties. It defines Damages broadly and expressly includes the multiplied portion of multiplied awards.

The Supreme Court has likewise recognized that False Claims Act treble damages are not purely punitive. In *Cook County v. United States ex rel. Chandler*, the Supreme Court described the False Claims Act's treble-damages remedy as serving both compensatory and punitive purposes. 538 U.S. 119, 130-32 (2003) ("To begin with it is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives. While the tipping point between payback and punishment defies general formulation,

being dependent on the workings of a particular statute and the course of particular litigation, the facts about the FCA show that the damages multiplier has compensatory traits along with the punitive.") (internal citations omitted). The Supreme Court explained that the statute's damages provision is designed not only to punish fraud but also to compensate the Government for the costs and consequences of false claims that may be difficult to quantify. *Id.* at 130-31.

Thus, the mixed character of False Claims Act treble damages does not place them categorically outside this Policy. To the contrary, the Policy specifically addresses multiplied awards by including "the multiplied portion of multiplied awards" within Damages. Dkt. 1-3 at 11. That express language distinguishes this case from one in which the policy simply covers "loss" but excludes all fines, penalties, punitive damages, or exemplary damages. The parties agreed to language that contemplates multiplied awards. This Court must therefore give that language effect. *See Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 28-30 (2019) (requiring courts to enforce the reasonable meaning of the policy as a whole). If Defendant intended to exclude all False Claims Act recoveries, all statutory multiplies, or all amounts sought in an action involving civil penalties, it could have said so. It did not.

The *Qui Tam* Complaint therefore sought relief within the Policy's definition of Damages. That is sufficient to satisfy the initial coverage grant.

(d) <u>The Present Record Does Not Establish That the Settlement Is an Excluded Fine, Penalty, Tax, Sanction, or Forfeiture.</u>

Defendant separately contends that the settlement payment falls outside the Policy's definition of Damages because it constitutes a fine, penalty, tax, sanction, forfeiture, or otherwise uninsurable amount. Defendant's argument is unsupported and unpersuasive.

The Policy's coverage grant applies to Damages resulting from a covered Claim, while the definition of Damages excludes or limits specified categories of payments. Dkt. 1-3 at 11.

Defendant therefore bears the burden of showing that the exclusion or limitation applies to the particular payment for which Plaintiff seeks coverage. *See SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 800 F. Supp. 2d 722, 731 (E.D. Va. 2011) ("Once the policyholder makes out a *prima facie* case, the burden shifts to the insurance company to prove an affirmative defense."). Because exclusions are construed narrowly, Defendant must establish that the settlement unambiguously falls within the relevant excluded category. *Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 242 (4th Cir. 1995) ("Exclusions from coverage are enforceable only when the exclusions 'unambiguously bring the particular act or omission within its scope.' Moreover, the burden rests on the insurer to establish the clear applicability of a particular exclusion from coverage." (citing *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 427 S.E.2d 193, 196 (1993))) (internal citations omitted). Indeed, another district judge in this District has previously held that a defendant failed to carry its burden under a policy exclusion in a separate action likewise governed by Virginia law. *Continental Casualty Co. v. AWP USA Inc.*, 2021 WL 1225968, at *12 (E.D. Va. Mar. 31, 2021). Defendant therefore is familiar with what it is required to show to satisfy its burden under Virginia law before this Court.

Defendant has not established that the Settlement Agreement was a civil penalty. The Settlement Agreement, which each party "freely and voluntarily enter[ed] into," resolved the Government's claims through a negotiated payment of $7.6 million. Dkt. 1-2 ¶¶ 1, 16. The Agreement does not allocate the payment among any particular forms of relief. *See id.* ¶ 1. It does not identify any portion of the payment as compensation for the Government's alleged losses. *Id.* It does not identify any portion as multiplied damages. *Id.* And it does not identify any portion as a civil penalty, sanction, forfeiture, or other excluded amount. *Id.* Instead, Plaintiff agreed to pay a single, undifferentiated sum in exchange for the Government's release of claims arising from the

conduct identified in the agreement. *Id.* This distinction is material and places the Civil Action falls squarely within the initial Technology and Professional Liability coverage grant.

C. Deliberate Acts/Commingling or Misappropriation of Funds Exclusion ("Deliberate Acts Exclusion")

The Court's preliminary determination that the Technology and Professional Liability coverage part does not apply to the CIDs likewise disposes of any question concerning application of the Deliberate Acts Exclusion to the CIDs. Because the exclusion operates only with respect to coverage under the Technology and Professional Liability provision, the Court considers its application only to the Civil Action.

The exclusion provides, in relevant part, that the Policy does not apply to any Claim "based upon or arising out of any dishonest, fraudulent, criminal or malicious act or omission, commingling, misappropriation or misuse of funds, intentional wrongdoing or knowing violation of any contract or agreement by or on behalf of an Insured." Dkt. 1-3 at 65. The exclusion further provides that Defendant "shall pay Claim Expenses of such Claims unless or until a final, non-appealable adjudication in any proceeding establishes that such act, omission, commingling, misappropriation, misuse, or violation was committed." *Id.* For the purposes of determining the exclusion's applicability, "only the facts pertaining to and knowledge possessed by an Executive Officer[4] shall be imputed to the Insured Entities." *Id.*

The parties dispute four principal issues: (i) whether the allegations of the *Qui Tam* Complaint can trigger the exclusion; (ii) the effect of the final-adjudication provision; (iii) whether

[4] The Policy defines Executive Officer to mean, "any duly elected or appointed Chief Executive Officer, Chief Financial Officer, Chief Information Officer, Chief Privacy Officer, Chief Security Officer, Chief Risk Officer, Chief Legal Officer, Risk Manager, General Counsel, in-house attorney designated to be in charge of litigation, or the functional equivalent of any of the foregoing, of the Named Insured." Dkt. 1-3 at 12.

the allegations concerning Plaintiff's Executive Officers establish excluded conduct; and (iv) whether the False Claims Act scienter necessarily falls within the exclusion. The Court addresses each in turn.

(a) The Court May Consider the Qui Tam Allegations, But They Must Necessarily Establish Excluded Conduct to Defeat the Duty to Defend.

Plaintiff first argues that allegations alone cannot trigger the exclusion because the exclusion refers to dishonest, fraudulent, malicious, intentional, and knowing acts without stating "actual or alleged." Dkt. 28 at 14. The Court does not read the omission that broadly. Virginia's Eight Corners Rule requires the Court to compare the allegations in the underlying complaint against the policy as a whole, including any exclusions. *Capitol Env't Servs.*, 536 F. Supp. 2d at 639; *Lerner v. Safeco*, 219 Va. at 104. An exclusion need not necessarily repeat the words "actual or alleged" before the Court may ask whether the conduct alleged falls within it. The Fourth Circuit's decision in *Jefferson-Pilot* is particularly instructive. 638 F.2d at 674-75. The exclusion there barred coverage for "dishonest, fraudulent, criminal or malicious" acts—language materially similar to part of the exclusion here. *Id*. The Fourth Circuit nevertheless compared that exclusion to the allegations of the underlying antitrust complaint. *Id.* Although not expressly addressed by the Fourth Circuit, that decision did not find that the absence of the words actual or alleged (which were also not present in that case) to be determinative. *Id.* But the Fourth Circuit also established that the allegations in a complaint must necessarily establish the excluded conduct. The Fourth Circuit held that, although the alleged antitrust violations were unlawful, that did not automatically make them dishonest, fraudulent, criminal, or malicious within the meaning of the policy. *Id.* at 674-75. Because the "moral quality" of the alleged acts remained susceptible to more than one interpretation, the exclusion did not eliminate the duty to defend. *Id.* The same principle follows from the Fourth Circuit's decision in *Fuisz*. There, applying Virginia law, the Fourth Circuit held

that an exclusion defeats the duty to defend only when it unambiguously encompasses all potentially viable bases of liability alleged in the complaint. 61 F.3d at 242-44 ("[A]n insurer is excused from its duty to defend the insured only where the complaint against the insured *clearly demonstrates no basis* upon which the insurer could be required to indemnify the insured under the policy.") (emphasis added). If the complaint permits recovery on a theory that does not necessarily require excluded conduct, the insurer remains obligated to defend. Here, as discussed *supra*, they do not and therefore the Deliberate Acts Exclusion does not apply.

(b) The Final-Adjudication Provision Independently Preserves Coverage for Claim Expenses.

Even assuming that the Deliberate Acts Exclusion may apply, it still would not preclude Plaintiff's recovery of all expenses because the Policy's coverage of Claim Expenses is more straightforward. The Policy expressly provides that Defendant "shall pay Claim Expenses" unless or until a final, non-appealable adjudication establishes the prohibited conduct. Dkt. 1-3 at 20. That language must be given effect. If allegations alone were sufficient to relieve Defendant of responsibility for Claim Expenses, the final-adjudication condition would do little work. The Policy instead contemplates that a Claim may allege conduct potentially falling within the exclusion while Defendant remains responsible for Claim Expenses until the specified adjudication occurs. No such adjudication occurred in the Civil Action; the matter settled. Further, the Settlement Agreement contains no adjudication of liability and no finding that Plaintiff committed dishonest, fraudulent, intentional, or knowingly wrongful conduct. Dkt. 1-2 at 6 ("This Settlement Agreement is neither an admission of liability by Guidehouse nor a concession by the United States that its claims are not well founded."). Accordingly, Defendant cannot rely on the Deliberate Acts Exclusion to avoid its obligation to pay qualifying Claim Expenses associated with the Civil Action.

(c) The Allegations Concerning Executive Officers Do Not Necessarily Establish Excluded Conduct.

Again, assuming that the Deliberate Acts Exclusion may apply (which it does not), the Exclusion does not permit Defendant to attribute the knowledge of every Guidehouse employee to Plaintiff. The Policy instead provides that, in applying the Exclusion, "only the facts pertaining to and knowledge possessed by an Executive Officer shall be imputed to the Insured Entities." Dkt. 1-3 at 21. Chief Information Officer Chas Shaffer qualifies as an Executive Officer under the Policy. *Id.* at 12. The relevant question is therefore what the *Qui Tam* Complaint alleges Shaffer knew and whether that knowledge, when attributed to Plaintiff, necessarily establishes dishonest, fraudulent, intentionally wrongful, or knowingly contractual misconduct.

The allegations concerning Shaffer do not extend that far. According to the *Qui Tam* Complaint, after concerns arose regarding the security of the ERAP system, Shaffer directed a cybersecurity review. Dkt. 1-1 ¶¶ 48-49. The review allegedly revealed that ERAP applicant information was publicly accessible and was not encrypted as required. *Id.* The *Qui Tam* Complaint further alleges that Shaffer learned of those findings and communicated them to Chris O'Brien, a Guidehouse partner in charge of Guidehouse's State and Local Government practice. *Id.* ¶ 50. Thus, for purposes of the exclusion, the *Qui Tam* Complaint permits the Court to attribute to Plaintiff only Shaffer's knowledge that the review had identified those cybersecurity deficiencies.

But the *Qui Tam* Complaint does not allege that Shaffer himself made the allegedly false certification to New York, directed anyone to make it, instructed anyone to conceal the security deficiencies, or decided that Guidehouse should continue representing that the ERAP system complied with contractual requirements despite knowing otherwise. Nor does it allege that Shaffer knew the contents of the particular certification at issue or knew that the identified cybersecurity

condition rendered that certification false. Thus, Defendant has failed to connect the knowledge imputable to Plaintiff to one of the forms of culpable conduct the exclusion actually identifies—such as dishonesty, fraud, intentional wrongdoing, or a knowing violation of the ERAP contract. Knowledge that applicant information was publicly accessible or insufficiently encrypted may establish knowledge of a cybersecurity deficiency, but it does not, without additional allegations, necessarily establish knowledge that Plaintiff was violating a particular contractual obligation or making a false representation to New York.

Defendant correctly observes that the imputation provision does not require an Executive Officer personally to perform every act giving rise to liability. Dkt. 42 at 7-9. If an Executive Officer possessed relevant knowledge, the provision permits that knowledge to be attributed to Plaintiff. But the provision does not permit the Court to combine an Executive Officer's knowledge of one fact with another employee's allegedly intentional conduct and thereby deem the corporation to have committed deliberate wrongdoing unless the underlying allegations support that inference. Those gaps preclude the Court from concluding that every potentially viable theory of liability necessarily rests on conduct imputable to Plaintiff under the exclusion.

(d) The False Claims Act Scienter Requirement Does Not Necessarily Satisfy the Deliberate Acts Exclusion.

The False Claims Act's scienter requirement leads to the same conclusion. Sections 3729(a)(1)(A) and (B) impose liability only when a defendant acts "knowingly," but the statute gives that term a specialized definition. 31 U.S.C. § 3729(a)(1)(A), (B). A person acts knowingly if the person has actual knowledge, acts in deliberate ignorance of the truth or falsity of information, *or acts in reckless disregard of the truth or falsity of the information*. *Id.* § 3729(b)(1)(A) (emphasis added). The statute expressly provides that no specific intent to defraud is required. *Id.* § 3729(b)(1)(B). Thus, the relator could have prevailed without

establishing intentional fraud or a knowing contractual violation. Indeed, the *Qui Tam* Complaint alleged the scienter alternatives in the statutory formulation: "knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth." Dkt. 1-1 ¶ 68. That matters because the Exclusion does not broadly exclude all conduct sufficient to establish False Claims Act liability. *See Boothe, Prichard*, 638 F.2d at 674-75 ("While antitrust violations are unlawful, we do not think that the allegations in the [] complaint automatically warrant a conclusion of 'dishonest, fraudulent, criminal or malicious' behavior."). Defendant's interpretation of "dishonest" would substantially expand the exclusion. Under that reading, conduct amounting only to reckless disregard would become "dishonest," even though the surrounding terms—fraudulent, malicious, intentional wrongdoing, and knowing violation—require materially greater culpability. Again, the Exclusion does not apply.

D. Privacy Regulation Investigation Expenses

The parties next dispute whether the 2023 and 2024 CIDs constitute "Privacy Regulation Investigations" for which Defendant must reimburse Plaintiff's qualifying expenses. The Policy provides reimbursement for "Privacy Regulation Investigation Expense," defined as "all reasonable and necessary expenses incurred by the Insured Entity with the Insurer's prior consent, in order to respond to or effectuate compliance with a Privacy Regulation Investigation." Dkt. 40 at 17. A "Privacy Regulation Investigation" includes a civil, administrative, or regulatory investigation or written request for information by a governmental authority "in connection with any law governing Protected Information or any Security Breach Notice Law, arising from an actual or alleged Privacy Injury." *Id.* The Parties agree that the CIDs were governmental investigations and written requests for information. Plaintiff does not assert that the CIDs concern any law governing Security Breach Notice Law, *see generally* Dkt. 1, so the relevant question is

whether they were issued "in connection with" a law governing Protected Information. "Protected Information" includes "Personal Information," which means "any information relating to an identified or identifiable natural person." *Id.* In short, the Court must consider whether those investigations were "in connection with" ERAP, whether ERAP is a law governing Protected Information, and, if those requirements are satisfied, what expenses fall within the Policy's reimbursement provision.

(a) <u>The CIDs Were Governmental Investigations and Written Requests for Information "In Connection With" ERAP.</u>

The fact that DOJ formally issued the CIDs pursuant to the False Claims Act does not resolve what those investigations were "in connection with," as the statutory source of DOJ's compulsory authority does not define the outer limits or substantive scope of the resulting investigation. Section 3733 authorized DOJ to issue the CIDs because it was investigating potential violations of the False Claims Act. *See* 31 U.S.C. § 3733(a)(1). But that answers only *why* DOJ had authority to compel information. It does not answer what information DOJ sought or what conduct it was investigating—it is the contents of the CIDs that identify that.

The purpose of a CID is to "enable the Government to determine whether enough evidence exist[s] to warrant the expense of filing [a civil] suit, as well as to prevent the potential Defendant from being dragged into court unnecessarily." H.R. Rep. 660, 99th Cong., 2d Sess. 26 (1986). Thus, courts have consistently "treated CIDs as a form of administrative subpoena." *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colleges & Schs.*, 854 F.3d 683, 688 (D.C. Cir. 2017); *see also In re Oral Testimony of a Witness Subpoenaed Pursuant to Civ. Investigative Demand No. 98-19*, 182 F.R.D. 196, 201 (E.D. Va. 1998) (finding that "a CID is an administrative subpoena"); *United States v. Sentara Healthcare*, 2024 WL 1023065, at *2 (W.D. Va. Mar. 8, 2024) ("Courts treat CIDs as if they were administrative subpoenas."). In *United States v.*

*Markwood*, 48 F.3d 969 (6th Cir. 1995), the Sixth Circuit explained that "Congress has given the Department of Justice *a particular type of investigative tool*, the false claims civil investigative demand, to enable it to investigate whether there is a basis for remedying a false claim made against the United States." *Id.* at 976 (emphasis added). The Sixth Circuit held that, "[a]though Congress has chosen to call this subpoena by another name, a false claims CID is, at its essence, a subpoena issued by an administrative agency." *Id.*

The False Claims Act thus supplies the procedural, investigative mechanism through which DOJ compels evidence relevant to its investigation. It does not necessarily follow that every fact investigated through that mechanism is substantively connected *only* to the False Claims Act in the sense relevant here. In a recent decision, the Fourth Circuit held that a government investigation into Under Armour's accounting practices was logically related to earlier securities claims concerning allegedly misleading public statements. *See Navigators Insurance Co. v. Under Armour, Inc.*, 165 F.4th 171 (4th Cir. 2026). Construing policy language deeming matters related when they were "logically or causally related," the Fourth Circuit explained that two matters are logically related when they are reasonably or rationally connected or associated. *Id.* at 189–90. Although the investigation there ultimately focused on conduct that was "not precisely the same" as the conduct alleged in the earlier litigation, the Fourth Circuit noted that Under Armour's "actions, as part of a single scheme, stemmed from a single goal." *Id.* at 184. Consequently, the Fourth Circuit found the matters related because the accounting practices were "reasonably and rationally connected" to the allegedly misleading statements and served the same underlying objective. *Id.*; *see also Navigators Specialty Insurance Co. v. Avertest, LLC*, 2026 WL 1662164 (4th Cir. June 9, 2026) (applying Virginia law and holding that claims were related because the acts giving rise to them shared the same underlying testing deficiencies, notwithstanding

differences in plaintiffs, individual events, and allegations). The same reasoning supports focusing on the substance of the CIDs rather than the statutory mechanism DOJ used to issue them and treating them as "in connection with" ERAP. Under the Fourth Circuit's "relatedness approach", the fact that DOJ investigated that conduct for the additional purpose of determining whether it gave rise to False Claims Act liability does not eliminate its connection to ERAP-related privacy requirements.

Here, the factual nexus is direct. The CIDs did not ask merely whether Plaintiff maintained general False Claims Act compliance procedures. The 2023 and 2024 CIDs sought information concerning Plaintiff's cybersecurity practices, its compliance with the ERAP Contract, and the June 2021 privacy incident, among other things. Dkt. 1 ¶ 12. The Northern District of Illinois described the investigation the same way when transferring this action, noting that the February 2023 CID investigated the June 2021 privacy incident and sought documents and answers concerning Plaintiff's cybersecurity and compliance with the ERAP Contract, while the later 2024 CID sought information concerning Plaintiff's implementation of ERAP and cybersecurity practices. *Guidehouse*, 2025 WL 2712277, at *1. Those subjects are not tangential to ERAP. They concern how Plaintiff implemented the program, whether it complied with ERAP-related contractual and security requirements, and how ERAP applicant information was handled during that work. Thus, the CIDs can be characterized accurately in two ways at once: (i) the CIDs were *issued pursuant to the False Claims Act* and (ii) the CIDs were *in connection with ERAP*. The Court therefore concludes that the CIDs were governmental investigations and written requests for information "in connection with" ERAP.

(b) <u>ERAP is a "Law Governing Protected Information," and the CIDs Arise from Alleged Privacy Injuries.</u>

The next question is whether the law governing New York's ERAP qualifies as a "law governing Protected Information." Defendant argues that they do not because ERAP is a rental-assistance program rather than a privacy statute. Dkt. 42 at 17. Plaintiff asserts that ERAP expressly regulates the collection, confidentiality, use, and disclosure of applicant information and therefore falls within the Policy's language. Dkt. 28 at 18-21.[5]

The Policy applies to "any law governing Protected Information." Dkt. 1 ¶ 38. "Protected Information" includes "Personal Information," defined broadly as information relating to an identified or identifiable natural person. *Id.* ¶ 39. Defendant's narrower construction would effectively read additional words into the Policy. The Policy does not require a "privacy law," a statute enacted primarily to protect personal information, or a law whose sole subject is data privacy. By its express terms, it applies to "*any* law governing Protected Information." *Id.* ¶ 38 (emphasis added). The Court therefore will not narrow the Policy's language by imposing an additional requirement that the relevant law be, in purpose or form, a privacy statute.

Further, ERAP satisfies that formulation because its operative provisions expressly govern the confidentiality, permissible use, and disclosure of applicant information. The parties focus primarily on the federal ERAP statute, which provides, under the heading "Privacy requirements," that each grantee must establish "data privacy and security requirements" for information collected through the program. *See* Consol. Appropriations Act of 2021, Pub. L. 116-260, § 501(g)(4)(A), 134 Stat. 1182, 2076 (2021), *codified at* 15 U.S.C. § 9058a(g)(4). Those requirements include measures protecting the "privacy of the individuals and households"; restrictions on the collection

[5] Although the Court could conclude that Defendant forfeited its arguments in this regard because they were raised for the first time in Reply, because Plaintiff independently seeks a declaration of coverage, the Court must still determine whether the Policy's affirmative coverage requirements are satisfied.

and use of information, "including any personally identifiable information"; and "confidentiality protections" for specified applicant data. *Id.* § 9058a(g)(4)(A)(i)-(iii). New York's ERAP statute implemented the federal program while imposing additional confidentiality protections, including requiring applicant information to "be kept confidential" and designating specified categories of sensitive information—including Social Security numbers, telephone numbers, place of birth, country of origin, employment and income information, public-benefit status, utility-account identifiers, and medical or disability information—as nonpublic and generally not disclosable in response to records requests. 2021 N.Y. Laws ch. 56, Part BB, Subpart A, § 6(4)(b)-(c). Accordingly, both federal ERAP and New York ERAP are privacy laws governing protected information.

The Court likewise concludes that the CIDs arose from an actual or alleged "Privacy Injury," as the 2023 CID expressly concerned the June 2021 exposure of ERAP applicants' personally identifiable information, and the 2024 CID continued the investigation into the same ERAP implementation and cybersecurity issues. Dkt. 1 ¶¶ 11-12, 18. Per the Policy, a Privacy Injury includes the "failure to implement, maintain, or comply with policies and procedures stating the Insured's obligations with regard to Protected Information." Dkt. 1-3 at 18. That is precisely what is at issue in the 2023 and 2024 CIDs. The 2023 CID sought information regarding Plaintiff's cybersecurity-related practices under the contract with OTDA, including compliance with cybersecurity-related contract terms and the data incident on June 1, 2021 where applicants' personally identifiable information ("PII") was exposed on the internet. Dkt. 1 ¶¶ 11-12. Similarly, the 2024 CID sought information relating to Plaintiff's implementation of ERAP, certain Information Security Incidents and Information Security Breaches, compliance with the ERAP contract, PII, and cybersecurity reviews. *Id.* ¶ 18.

(c) CID Coverage Does Not Determine the Scope of Reimbursement, and the Choice-of-Counsel Provision Does Not Apply.

The conclusion that the CIDs qualify as Privacy Regulation Investigations establishes that the Policy's reimbursement provision applies. It does not, however, establish that every expense Plaintiff incurred in connection with the CIDs is reimbursable.

The Policy defines "Privacy Regulation Investigation Expense" as "all reasonable and necessary expenses incurred by the Insured Entity with the Insurer's prior consent, in order to respond to or effectuate compliance with a Privacy Regulation Investigation." Dkt. 1 at 8. Thus, recoverable expenses must bear the required relationship to Plaintiff's response to the CIDs and must otherwise satisfy the Policy's requirements concerning reasonableness, necessity, and consent. The Policy also limits reimbursement to expenses "incurred within twelve months after the date that the Insured reports the Privacy Event." Dkt. 1-3 at 9. These requirements concern the amount of Defendant's reimbursement obligation; they do not alter the threshold conclusion that the CIDs themselves are covered Privacy Regulation Investigations. Plaintiff therefore must establish that each claimed expense satisfies the Policy's requirements concerning purpose, reasonableness, necessity, and timing.

The parties also dispute whether the Policy's Choice of Counsel Endorsement operates to limit Defendant's reimbursement obligation. It does not. The Policy expressly applies this provision "to any Claim for which the Insured has tendered to the Insurer." Dkt. 1-3 at 44. The Policy also expressly excludes civil investigations from the definition of "Claim." Nor does the separate coverage section for Privacy Regulation Investigation Expenses contain a comparable requirement that the insured use counsel selected or approved by Continental. The Court will not import such a requirement into a distinct coverage provision. The CIDs therefore did not trigger

the Policy's Choice of Counsel Endorsement provision and Plaintiff's use of counsel of its own choosing does not curb Defendant's reimbursement obligation.

Even assuming the Policy otherwise gave Defendant a right to approve or select counsel, that right could not be invoked after Defendant denied coverage (Dkt. 40 at 9). Virginia law does not permit an insurer to disclaim coverage and then rely on consent-based provisions, which were designed to protect the insurer's participation in the handling of a covered matter, in order to challenge the insured's subsequent handling of the matter. *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.*, 709 F. Supp. 2d 441, 449 (E.D. Va. 2010) ("Under Virginia law, however, an insurer that denies coverage waives the right to assert the consent requirements of the policy."); *see also Credit Gen. Ins. Co. v. Abateco Servs., Inc.*, 2000 WL 35792722, at *3 (E.D. Va. February 25, 2000) ("Upon finishing their investigation, Credit General issued a letter denying liability, thereby effectively waiving the contract's consent requirement."), *aff'd in rel. part*, 11 Fed. App'x. 47, 50 (4th Cir. 2001) (affirming waiver by insurer of the policy's consent requirement "on the reasoning of the district court," but vacating summary judgment on other grounds). Accordingly, this provision does not limit Plaintiff's recovery.

## IV. CONCLUSION

In sum, the Civil Action was a claim under the Technology and Professional Liability provision to which the Deliberate Acts provision does not apply. Thus, Defendant was required to defend Plaintiff in such action and is responsible for the settlement less the applicable retention of $5,000,000. Furthermore, the expenses related to the CIDs are also covered as Privacy Regulation Investigation Expenses.

Accordingly, for the foregoing reasons, it is hereby ORDERED that Plaintiff's Motion for Judgment on the Pleadings is GRANTED; and it is

FURTHER ORDERED that Defendant's Motion Cross-Motion for Judgment on the Pleadings is DENIED; and it is

FURTHER ORDERED that the Counts II and III of the Counterclaim are DISMISSED; and it is

FURTHER ORDERED that the parties are DIRECTED to contact the chambers of U.S. Magistrate Judge Ivan D. Davis within FOURTEEN (14) DAYS to schedule a settlement conference; and it is

FURTHER ORDERED that this matter is STAYED and the Clerk of the Court is DIRECTED to place it among the inactive causes pending such settlement conference; and it is

FURTHER ORDERED that the parties are DIRECTED to file a status report within FOURTEEN (14) DAYS of the settlement conference advising the Court of the results of such conference and whether the stay should be lifted.

It is SO ORDERED.

Alexandria, Virginia
September 29, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge